UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVIE SHELTON,

                Plaintiff,               CIVIL ACTION NO. 08-13127

        v.                      DISTRICT JUDGE JOHN FEIKENS

COMMISSIONER OF            MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

                Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.  PROCEDURAL HISTORY

### A.  *Proceedings in this Court*

On July 21, 2008, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of

reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability

insurance  (Dkt. 3).  This matter is currently before the Court on cross-motions for summary

judgment (Dkt. 20, 22).

### B.  *Administrative Proceedings*

Plaintiff filed the instant claims on March 21, 2005, alleging that he became unable to

work on August 1, 2004 (Tr. 13, 44-46).  The claim was initially disapproved by the

Commissioner on June 21, 2005 (Tr. 36-40).  Plaintiff requested a hearing and on January 24,

2008, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) E. Patrick Golden,

who considered the case *de novo*.  In a decision dated February 14, 2008, the ALJ found that

Plaintiff was not disabled (Tr. 13-19).  Plaintiff requested a review of this decision on March 8,

2008 (Tr. 7).  The ALJ's decision became the final decision of the Commissioner when the

Appeals Council, on May 16, 2008, denied Plaintiff's request for review (Tr. 4-6); *Wilson v.*

*Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

    In light of the entire record in this case, I find that substantial evidence supports the

Commissioner's determination that Plaintiff was not disabled.  Accordingly, it is

**RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's

motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be

**AFFIRMED**.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

    Plaintiff was 52 years old at the time of the most recent administrative hearing (Tr. at 18).

Plaintiff's relevant work history included work as a welder, which is classified as semi-skilled,

light work (Tr. at 18).

    The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one

that Plaintiff had engaged in some substantial gainful activity since August 1, 2004 – having

earned nearly $12,000 in 2005 – but that, even if he were to find the income to be substantial

gainful activity,  it would not be dispositive of the entire period of alleged disability (Tr. at 15).

Thus, the ALJ permitted Plaintiff to proceed past step one.  At step two, the ALJ found that

Plaintiff had the following "severe" impairments: seizure disorder and status post right hip operation  *Id*.  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations.  *Id.*  Between steps three and four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform a limited range of light work.  In particular, the ALJ found that Plaintiff "can lift at least 20 pounds occasionally; lift 10 pounds frequently; sit, stand or walk for six eight (sic) hours each in a work day; push or pull without limitation; perform postural activities at least frequently; perform any manipulative functions; see, hear and speak without limitation; and perform work in any environment not exposing him to obvious hazards or moving machinery. Mentally, [Plaintiff] can understand, remember and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting" (Tr. 16).

At step four, the ALJ found that Plaintiff could not perform his previous work as a welder, as the vocational expert (VE) testified that this work is inappropriate for an individual with a seizure disorder (Tr. 18).  At step five, the ALJ denied Plaintiff benefits because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as janitor, hand packager and lobby attendant (Tr. 18-19).

### B.    *Administrative Record*

#### 1.    **Plaintiff's Testimony and Statements**

Plaintiff testified at the hearing that he stopped working in August 2004, due to a broken hip (Tr. 215).  He stated that he broke his hip in March 2003, and had returned to work for a

while in 2004, but then his job was eliminated (Tr. 216). He had undergone rehabilitation of his

hip and was ready, willing, and able to work in 2004 – and did, in fact, work – until his job was

eliminated (Tr. 216-17). Plaintiff testified that there never was a time when – had his job not

been eliminated – he could no longer perform his job due to a disability (Tr. 218).

Plaintiff's attorney then elicited testimony that Plaintiff filed his claim due to his seizure

disorder (Tr. 219). Plaintiff testified that he had a seizure in 2004, fell inside the General Motors

(GM) plant in which he was working, broke his hip and, after he recovered, his employer's

medical team would not let him return. Asked when he last had a seizure, Plaintiff stated that it

was "over two years, a year ago" (Tr. 219). He testified that he did not drive due to this

condition. *Id.* Plaintiff could not remember whether he last had a seizure in 2004 or 2005 (Tr.

220), but stated that his girlfriend was with him when he had his last seizure (Tr. 221). She told

him he passed out for about 10-15 minutes. He went to the hospital, where he stayed overnight

(Tr. 221-22).

Plaintiff testified that he took Dilantin for his seizures, and his doctor told him not to

drink alcohol when taking this medication (Tr. 222). He stated that he had stopped drinking

about a year earlier (Tr. 223). He then stated that he had not had a seizure in a year and a half and

then stated that he thought it was two years (Tr. 223-24).

Plaintiff testified that he could not go back to work because of his broken hip and seizures

(Tr. 224). He acknowledged that he had worked after the hip surgery, until he had a seizure. He

testified that he did not have any pain in his hip at the time, but his doctor had said that he should

-4-

make sure not to bump it or hit it (Tr. 224). If someone offered him a job, he stated that he could

not do it because he could not stand long, and he could only sit for 10-20 minutes before his hip

tightened and he had to get back up and walk around (Tr. 224-25).

Plaintiff further testified that, when he arose and sat down, he had a sharp pain in the hip

that he described as "medium" (Tr. 225). This pain lasted 5-10 minutes and then went away (Tr.

226). He said he got this pain 4-5 times a day. Plaintiff stated that he did not get the pain when

he remained in one position. *Id.*

Plaintiff testified that he thought he could drive a car, but that he was afraid he might

have a seizure while driving (Tr. 226). He stated that his hip condition would not prevent him

from driving (Tr. 227). He testified that he had a limp, but could walk without a cane. *Id.* He

testified that he could not sit through a movie, but would have to get up after about 20-30

minutes (Tr. 227-28).

Plaintiff testified that he was currently being treated by Dr. Cowsill, whom he had been

seeing for about 5-6 years (Tr. 231). He saw him about every three months and at that time the

doctor checked his Dilantin level (Tr. 231). He took Dilantin three times a day. He had made an

effort to give up alcohol about a year previously and testified that he had nothing to drink during

that period. *Id.*

Plaintiff testified that he had no side effects from the Dilantin (Tr. 232). He also took

medication for his blood pressure, which also produced no side effects. He did not take

medication for his hip condition, including no pain medication. He could dress himself, take care

of his personal needs, and do "[j]ust about everything" with regard to work around the house (Tr.

232-33). During the day, he watched television, listened to music, and walked around inside the

-5-

house (Tr. 233-34).  When the weather was good, he sat outside by the picnic table, but he did

not do any outside work (Tr. 234).

Asked if he could do a job that did not involve the use of machines, but where he used a

broom to clean offices eight hours a day, Plaintiff stated that he could not do it (Tr. 236-37).  As

to why he could not do it, Plaintiff testified: "well, I just say, well, now I just say pain.  That's the

only thing I can think of" (Tr. 237).  Reminded that he had said that he only had a little pain,

Plaintiff said he could clean offices all day if he could take a break when he thought he needed to

do so, but he could not say how many breaks he would need during the work day.  Then he stated

that he could not work more than 4-5 hours because he would become exhausted and probably

pass out (Tr. 238-39).  Plaintiff stated that during the past two years he had never done anything

at home, such as putting up Christmas decorations or cleaning the house, where he extended

himself (Tr. 239).

Plaintiff acknowledged that it was his guess as to when he last had a seizure (Tr. 239).

He stated that his girlfriend would know (Tr. 239-40).

### 2.      Plaintiff's Girlfriend's Testimony

Plaintiff's girlfriend – Queenie Hawkins – testified that she thought that Plaintiff's last

seizure was "probably . . . last year" (Tr. 241).  She then testified that she thought it was in

November 2006 (Tr. 242).  Plaintiff was sitting watching television and then he fell over, was

shaking and kicking, and "slobbing at the mouth" (Tr. 242).  He was "out of it," and she called

the paramedics.  *Id.*  Ms. Hawkins stated that it was about an hour before Plaintiff regained

consciousness, and that Plaintiff stayed at the hospital for 4-5 hours before being allowed to go

home (Tr. 242-43).

Ms. Hawkins testified that she saw Plaintiff have about 12 or more seizures since about 1996 (Tr. 243). She had last seen him have an alcoholic drink the previous year in about June or August 2007 (Tr. 244). During the day, Plaintiff watched television, cleaned up, and cooked (Tr. 246). Ms. Hawkins stated that Plaintiff kept a very clean home. Ms. Hawkins did not think that Plaintiff could work at a job because he was going to have seizures (Tr. 246). Asked if he complained about his hip, she stated that he did so "[a]ll of the time" (Tr. 246).

### 3.       Medical Evidence

Plaintiff fell while working at GM during a seizure in March 2003 (Tr. 92). As a result of this fall, Plaintiff's right hip was fractured, and he underwent open reduction internal fixation surgery, which (records indicate) Plaintiff "tolerated well" (Tr. 92, 102-04). Plaintiff then participated in physical therapy (Tr. 118-25, 205). Treatment records indicate that Plaintiff was being weaned off a walker in May 2003 (Tr. 205-06).

During the period from July 2003 through April 2005, Plaintiff saw Christopher Nicholas, D.O., about his hip condition. In July 2003, Plaintiff stated that he thought he was still progressing in physical therapy, and Dr. Nicholas ordered 4 additional weeks of therapy (Tr. 205). By August 2003, records indicate that his pain had diminished, and Plaintiff was not interested in discussing hip replacement or hemiarthroplasty (half hip replacement) (Tr. 204). During September and October 2003, Plaintiff stated that he felt better, but there was an issue of whether there was a bone infection (Tr. 202-03). By October 22, 2003, Dr. Nicholas indicated that bone scans produced no good evidence of a bone infection although there remained a question of a soft tissue infection (Tr. 202). However, Plaintiff stated that the pain had diminished, and he denied significant groin pain. He had some limited motion of the hip without

severe pain and no significant swelling. Further, laboratory testing provided no strong evidence of any infection. *Id.* Plaintiff was to increase his activities and return to the office as needed. He might need a hip replacement in the future. *Id.*

On April 1, 2004, Plaintiff had another seizure while at work at GM, and he was taken to the hospital (Tr. 169-70; Tr. 153-64). The hospital records show that Plaintiff admitted that he ran out of Dilantin two days previously (Tr. 156). During the time he was at the hospital, Plaintiff stated that he had 3-4 beers or a half-pint of gin every day (Tr. 162).

Plaintiff next returned to see Dr. Nicholas on June 9, 2004, when he stated that he was doing "good" and he denied "any specific pain" (Tr. 201). He also denied "any significant pain over the area of the heterotopic bone on the lateral aspect of the hip." *Id.* Dr. Nicholas noted that Plaintiff was comfortable with the status of his hip and that he "would not place him on any significant restrictions." *Id.* He thought that later in life Plaintiff might develop further arthritic changes or need restrictions such that he would want a hip replacement or other procedure. When Plaintiff returned to see Dr. Nicholas on August 16, 2004, he stated that he was doing even "better" and "was not having any problems with the hip at this time" (Tr. 201). On examination, there was significant loss of range of motion of the hip, but no irritability. Dr. Nicholas stated that "Plaintiff has no complaints." *Id.*

On August 19, 2004, Plaintiff complained to Dr. Cowsill of right hip pain and pain in the groin area (Tr. 196). Dr. Cowsill counseled him to refrain from using tobacco and alcohol. At this time, Dr. Cowsill indicated that Plaintiff should not lift more than 20 pounds and should not stoop or kneel (Tr. 195).

-8-

In August 2004, the medical department of GM informed Plaintiff that he needed to be seizure-free for six months before he could return to work (Tr. 166).

On November 8, 2004, Plaintiff was taken to the emergency room with a seizure (Tr. 171-83).  At this time, he reported consuming alcohol occasionally (Tr. 180).  Shortly thereafter, Plaintiff saw Dr. Cowsill for follow-up of the November 8, 2004 seizure (Tr. 182).  Plaintiff reported that his Dilantin level was determined to be low at the hospital (Tr. 189).  He stated that he had his last drink of alcohol on April 7, 2004.  Dr. Cowsill reported that he again counseled Plaintiff on tobacco and alcohol abuse, and prescribed Phenytek, a medication for epilepsy (Tr. 189).  On January 17, 2005, Plaintiff saw Dr. Cowsill and stated that he had no new seizures since the last one and continued to drink "two 40 ounce containers of beer or more" per day (Tr. 186).  At this visit, Plaintiff refused a referral to "AA" (presumably Alcoholics Anonymous). *Id.*

On April 8, 2005, Plaintiff returned to see Dr. Cowsill, and it was noted that he had not had a seizure since November 2004 (Tr. 184; Tr. 200).  He continued to complain of hip pain.  He stated that he tried to go back to work, but the company could not find a job for him. He asked the doctor to complete disability papers.  He consumed about 60 ounces of beer a day and was not convinced of the need to quit his use of tobacco and alcohol.  Plaintiff was to remain on Dilantin.

In April 2005, Plaintiff returned to see Dr. Nicholas for an exacerbation of his hip pain after bumping his hip about two weeks previously (Tr. 198).  He stated that the pain had improved since that time.  X-rays showed that the hip had healed well, although a hip screw was

-9-

noted to be prominent and could be the source of discomfort. *Id.* On examination, there was no pain with internal or external rotation of the hip or any obvious irritability of the joint. The range of motion of the hip was, however, significantly limited. *Id.* Plaintiff did have some discomfort over the lateral aspect of the hip in the area of the prominence of the hip screw, which was probably the source of his discomfort. The impression was "[i]rritable internal fixation, healed right hip fracture" (Tr. 198). Dr. Nicholas stated that he thought it was "reasonable to consider removing a portion or all of the hardware" (Tr. 198). This, according to Dr. Nicholas, was up to Plaintiff, but Plaintiff could "continue to be weight-bearing as tolerated." Dr. Nicholas stated that he "suspect[ed]" that Plaintiff "would have some limitations with the amount of bone formation of the previous injury and the loss of motion of the hip." He added that it was likely that a hip replacement might be reasonable to consider in the future, but this too was up to Plaintiff and how his symptoms affected him. Plaintiff was to return as needed. *Id.*

### 4.    Vocational Expert

Raymond Dulecki, a vocational expert (VE), testified that Plaintiff's past work as a welder was unskilled, light work (Tr. 228). The ALJ asked the VE whether there were unskilled jobs at the sedentary or light levels that did not involve moving machinery (Tr. 254). The VE answered affirmatively, and stated that there were about 30,000 such jobs at the "light" level in the region of southeast Michigan and about 4,000 jobs at the "sedentary" level. Examples at the light level included hand packager, janitor, and stock worker; at the sedentary level, there were about 2,000 jobs in the industrial setting, such as visual inspector and hand packager, and about 2,000 jobs such as building attendant or lobby attendant (Tr. 254).

### C.    *Plaintiff's Claims of Error*

Plaintiff essentially makes one argument in his brief.  He argues that the ALJ erred in rejecting what he claims to be the medical opinion of Dr. Nicholas that Plaintiff was limited to bearing weight "as tolerated" and thus, in accordance with the testimony of the VE, he could not perform substantial gainful activity. (Pl.'s Br. at 4-5).  All other arguments are waived.[1]

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

---

[1] *See Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) ("Since the attorney at the hearing did not pursue this argument and the argument was not presented to the district court, it appears that the argument has been abandoned.") (citation omitted); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (citation and internal quotation omitted).

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.").  "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006);

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only.  *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

**B.     *Governing Law***

The "[c]laimant bears the burden of proving his entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

-14-

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

-15-

### C.      Analysis and Conclusions

After review of the record, I conclude that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim.

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner.  As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion.  *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Here, Plaintiff saw Dr. Nicholas in June 2004, told the doctor that he was doing "good" and denied "any specific pain;" and Dr. Nicholas noted in his progress note that Plaintiff was comfortable with the status of his hip and that "he would not place him on any significant restrictions" (Tr. 201).  In August 2004, the month in which Plaintiff alleges he became disabled, he told Dr. Nicholas that he was doing even "better" and "was not having any problems with the hip at this time" (Tr. 201).  On examination, there was a significant loss of range of motion of the hip, but no irritability.  Dr. Nicholas stated that Plaintiff "has no complaints" (Tr. 201). Defendant correctly points out that the statement in Dr. Nicholas's notes on which Plaintiff relies was made in April 2005, after Plaintiff returned to his office for an exacerbation of hip pain after bumping his hip about two weeks previously (Tr. 198).  At that time, Plaintiff stated that the pain had diminished since the incident.  Dr. Nicholas noted that x-rays showed that the hip had healed well, although a hip screw was noted to be prominent, and the doctor indicated that it could be the source on discomfort.

-16-

On examination, there was no pain with internal or external rotation of the hip or any obvious irritability of the joint.  As before, the range of motion of the joint was significantly limited.  And the doctor noted that there was some discomfort over the lateral aspect of the hip in the area of the prominence of the hip screw, which, he noted, was probably the source of the discomfort.  Dr. Nicholas stated that it would be reasonable to consider removing part or all of the hardware inserted during the surgery.  Dr. Nicholas indicated that whether to undergo such a procedure was up to Plaintiff.  He added that Plaintiff could "continue to be weightbearing as tolerated" (Tr. 198).  This is the last record from Dr. Nicholas submitted by Plaintiff.

Defendant argues that Dr. Nicholas's statement that Plaintiff could "continue to be weightbearing as tolerated" does not constitute an assessment of Plaintiff's work-related abilities as set forth in the regulations.  Defendant's argument is well-taken.  The limitations lack the specificity required of a medical opinion and leave to Plaintiff to determine when and for how long he needed to be off his feet.  Plaintiff stated that he had no complaints several months before Dr. Nicholas made this statement and attributed his current pain, which he said was resolving, to an incident in which he bumped into something (Tr. 198).  While Dr. Nicholas thought Plaintiff's pain was attributable to the prominence of the screw seen on the x-ray and suggested the possible removal of the screw and other hardware, he made no comment as to whether this current "irritability" was likely to persist and for how long.  He clearly thought - and had thought for some time - that Plaintiff might at some point need further surgery or a hip replacement, but he did not indicate that this was the case at this time.

Plaintiff also contends that the ALJ was required to credit Plaintiff's statement that he could only work at his own pace due to pain.  *See* Pl.'s Br. at 4.  Here Plaintiff cites two cases for

-17-

the proposition that a claimant's statements of pain may be enough to prove a disability. *See* Pl.'s Br. at 4, *citing Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 538 (6th Cir. 1978); *King v. Heckler*, 742 F.2d 968, 984 (6th Cir. 1984). Defendant correctly argues that these cases stand for the proposition that pain alone may be disabling and that, when the evidence is sufficient, the ALJ must find the claimant's claims supported. However, in *Kirk, supra*, the Court concluded that where the medical and other evidence did not clearly support Plaintiff's pain complaints, the ALJ was not required to find the him disabled. In *King, supra*, the Court concluded that the evidence clearly supported Plaintiff's claims of pain. A claimant's complaints alone cannot support a finding of disability. 20 C.F.R. § 404.1529(a).

Further, the undersigned finds that the record is replete with contradictory statements by Plaintiff. For example, Plaintiff first testified that there never was a time when he would have said that he could not work until his job was eliminated, and, had the job not been eliminated, he would never have said he could not do it (Tr. 218). Plaintiff's attorney then elicited testimony that he filed his disability claim due to his seizure disorder (Tr. 219). Plaintiff gave contradictory testimony as to when he had his last seizure, but the record is clear that his seizures were under control with medication. Plaintiff testified that he did not have hip pain, but he could not work because he needed to protect the hip (Tr. 224). Then he said he could not work because he could not sit or stand too long and had pain when he changed positions, but not when he remained in one position (Tr. 225-26). Later, when asked why he could not perform a job cleaning offices (and not involving machines), he testified "well, I just say, well, now I just say pain. That's the only thing I can think of" (Tr. 237). Reminded that he had just said that he had only a little pain, he said he could probably clean offices all day if he could take a break whenever he needed to,

-18-

but he did not think he could work more than 4-5 hours because he would become exhausted and probably pass out (Tr. 238-39).

Given the inconsistencies in the record, the ALJ was entitled to find Plaintiff, and specifically Plaintiff's subjective complaints of pain, not fully credible. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying.").

In sum, after a review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** that Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to

this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.

1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

magistrate judge.

      Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.


           S/Mark A. Randon
           MARK A. RANDON
           UNITED STATES MAGISTRATE JUDGE

Dated:  January 14, 2010

### Certificate of Service

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 14, 2010, by electronic and/or ordinary mail.*

           *s/Melody R. Miles*
           *Case Manager to Magistrate Judge Mark A. Randon*